FILED
2021 Feb-24  PM 01:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA MIDDLE DIVISION

| | |
|---|---|
| **OUSTER HUNTER,** ) | |
| ) | |
| **Claimant,** ) | |
| ) | |
| **v.** ) | |
| ) | **CIVIL ACTION** |
| **ANDREW M. SAUL,** ) | **NO. 4:19-CV-1526-KOB** |
| **ACTING COMMISSIONER OF** ) | |
| **SOCIAL SECURITY,** ) | |
| ) | |
| **Respondent.** ) | |
| ) | |

## MEMORANDUM OPINION

## I.     INTRODUCTION

On March 18, 2016, the claimant, Ouster Hunter, protectively filed a Title XVI application for supplemental security income, alleging disability beginning January 1, 2015, because of illiteracy, depression, and back pain.  The Commissioner denied the claimant's application for disability insurance benefits on July 1, 2016, and the claimant filed a timely request for a hearing before an Administrative Law Judge (ALJ). The ALJ held a hearing on April 19, 2018.  (R. 77-91, 101-02, 123-25, 168).

The ALJ found that the claimant was not disabled in a decision dated September 24, 2018. On that same day, the claimant appealed to the Appeals Council, but it denied the claimant's request for review on July 23, 2019.  (R. 1-6, 10-24, ).  Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration.

The claimant has exhausted his administrative remedies, and this court has jurisdiction

pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court AFFIRMS

the decision of the Commissioner.

## II.     ISSUES PRESENTED

1.   Whether the ALJ gave proper weight to the opinion of consultative, examining physician Dr. June Nichols;

2.   Whether the ALJ correctly found that the claimant did not meet Listing 12.05 for intellectual disability; and

3.   Whether substantial evidence supports the ALJ's reliance on the vocational expert's testimony that other work in the national economy exists that the claimant can perform where the ALJ's hypothetical to the VE did not include all of the claimant's alleged limitations.

## III.     STANDARD OF REVIEW

The court's scope of review is limited to determining (1) whether substantial evidence

exists in the record as a whole to support the findings of the Commissioner, and (2) whether the

ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420,

1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker* F.2d at

999. This court does not review the Commissioner's factual determinations *de novo*. The court will

affirm those factual determinations that are supported by substantial evidence. "Substantial

evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402

(1971).

This court must keep in mind that opinions such as whether a claimant is disabled, the

nature and extent of a claimant's residual functional capacity, and the application of vocational

factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgement for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV.   LEGAL STANDARD

### *Intellectual Disorder under 12.05B*

The requirements to meet Listing 12.05 for intellectual disability changed effective January 17, 2017.  The new version of Listing 12.05 applies to all social security applications pending on or after January 17, 2017.  *See* 81 F.R. 66138–01. Because this case was pending on January 17, 2017, the revised Listing 12.05 applies.

The revised Listing 12.05 "paragraph B" sets out criteria for establishing an intellectual disorder. To meet Listing 12.05 "paragraph B," the claimant now must satisfy the following three requirements:

> 1. Significantly subaverage general intellectual functioning evidenced by a or
> b:

a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

a. Understand, remember, or apply information (see 12.00E1); or
b. Interact with others (see 12.00E2); or
c. Concentrate, persist, or maintain pace (see 12.00E3); or
d. Adapt or manage oneself (see 12.00E4); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. Pt. 404, Sub. P, App. 1, § 12.05.

*Assessing Medical Opinions*

The ALJ "must state with particularity the weight given to different medical opinions" and the reasons for his finding; the failure to do so is reversible error. *Romeo v. Comm'r of Social Security*, 686 F. App'x 731, 732 (11th Cir. 2017) (citing *Winschel v. Comm'r of Social Security*, 631 F.3d 1176, 1179 (11th Cir. 2011)). The ALJ's stated reasons must be legitimate and supported by the substantial evidence in the record. *See Tavarez v. Comm'r of Social Security*, 638 F. App'x 841, 847 (11th Cir. 2016) (finding that the "ALJ did not express a legitimate reason supported by the record for giving [the consulting physician's] assessment little weight.").

In determining the weight to give medical evidence, an ALJ must consider whether a medical opinion is well-supported and consistent with the record. *Hargress v. Comm'r of Soc. Sec.*,

883 F.3d 1302, 1305 (11th Cir. 2018).  "These factors apply to both examining and non-examining physicians." *Huntley v. Social Security Administration, Commissioner*, 683 F. App'x 830, 832 (11th Cir. Mar. 29, 2017) (citations omitted).

To determine the weight to give a medical opinion, an ALJ must consider several factors, including the examining relationship, the treatment relationship, the evidence presented to support the opinion, the consistency of the opinion with other evidence, and the specialization of the medical professional. 20 C.F.R. §§ 404.1527(c), 416.927(c).  The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Hearn v. Comm'r of Soc. Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015) (citing *Bloodsworth*, 703 F.2d at 1240). However, the ALJ must "state with at least some measure of clarity the grounds for his decision." *Winschel*, 631 F.3d at 1179.

*Vocational Expert Testimony as Substantial Evidence*

After determining that the claimant cannot perform his past relevant work, the ALJ must articulate specific jobs that the claimant is able to perform, and substantial evidence must support this finding  *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002); *see also Allen v. Sullivan* 880 F.2d 1200, 1201 (11th Cir. 1989).

For a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the claimant's impairments. *Vega v. Comm. of Social Security*, 265 F.3d 1214, 1220 (11th Cir. 2001); *see also Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999).  But an ALJ is not required to include limitations or impairments in the hypothetical posed to the vocational expert unsupported by substantial evidence. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).

## V.    FACTS

The claimant was forty-eight years old at the time of the ALJ's final decision. The claimant was in special education classes, has a limited ability to read and write, and completed 10th grade in high school. He last worked in 2008, and his past work was as an auto detailer, hand packager, poultry hanger, and lumber handler.  He alleges disability because of illiteracy, depression, and back pain.  (R. 20, 77, 80-84, 202).

Upon referral by a court resource officer after his second DUI citation, social worker Susan Reid at C.E.D. Mental Health Center evaluated the claimant for alcohol dependency in July and August 2004.  That evaluation revealed the claimant's alcohol addiction and his denial of his need for treatment.  Three years later, in April and May of 2007, the claimant returned to C.E.D. Mental Health Center upon another court referral for mental health services for his alcohol dependency. His diagnosis included alcohol dependency without physical dependency and his treatment plan included 36 individual counseling sessions. The court can find no record of those sessions.  (R. 275-296).

The record contains no treatment records from 2007 through March of 2011.  On April 28, 2011, at the request of the Social Security Administration in the claimant's previous disability case,[1] Dr. Morton S. Rickless conducted a consultative physical examination of the claimant. The claimant alleged back pain and leg pain.  Dr. Rickless' physical examination showed that the claimant had no muscle spasms, mild scoliosis, tenderness in his lower lumbar region, some limited range of motion, a normal gait, 5/5 muscle strength, normal reflexes, and a negative straight leg test.  The claimant had audible and understandable speech, could get in and out of the chair and on and off the examination table with no discomfort, and did not need an assistive device.  X-rays of his lumbar spine showed only minimal degenerative joint disease at L-3.  Dr. Rickless found "no

---

[1]  The court can find no other records regarding the claimant's previous disability findings.

objective evidence to limit sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling."  (R. 313-16).

The record is bare from 2011 until April 11, 2016 when the claimant completed his "Function Report-Adult" at the request of the Social Security Administration relating to his current disability application.  In that report, the claimant indicated that he had been in "special classes" all his life, has problems sleeping, takes no medications, and does not drive because he no longer has a driver's license. He sometimes wears the same clothes or cannot find his clothes, and his family sometimes has to remind him to bathe, wash his hair, and shave.  The claimant indicated that he prepares his own meals, can do household chores with help and encouragement, goes out alone, can shop in stores, can pay bills, and can count change.  His hobbies include playing cards, listening to music, and throwing the football, and he does all of these things with others weekly.

He does not need reminders to go places and does not need anyone to accompanying him when he leaves his home.  The claimant stated that he has problems with his memory, completing tasks, concentrating, understanding, following written instructions, and getting along with others, including authority figures.  The claimant indicated that that he had been fired or laid off from a job because of his problems getting along with others and that he has problems handling stress and changes in his routine.  He did not mention any physical limitations in his function report.  (R. 201-208).

The claimant's friend Rose Martin completed a "Function Report-Third Party" on May 24, 2016.  Ms. Martin indicated that the claimant has problems reading and writing; has had problem since his mother's death two years prior; has a speech impairment; needs special reminders to take care of his grooming; goes places on his own; does not drive; and can shop in stores.  Ms. Martin also stated that the claimant's only hobby and interest is "sitting to himself"; that he needs

reminders to go places; and that he needs someone to accompany him when he goes somewhere. She also indicated that the claimant has problems talking, hearing, completing tasks, concentrating, understanding, following instructions, and getting along with others. (R. 229-236).

At the request of the Social Security Administration, Dr. June Nichols completed a psychological evaluation of the claimant on June 7, 2016. The claimant stated that he completed the 10th grade at Litchfield high school, where he received special education services. He reported that the school said he was a "problem child because he didn't get along with folks, so they kicked me out." He has never married and has five children. He last worked at Cooks Foods but his back pain prevented him from continuing at that job. He worked for about three months at Brookwood Hospital in housekeeping, but he had to leave that job to take care of his sick mother; he said he does not "last long" on a job because "he cannot handle being around people." He said he currently lives with his sister who takes care of everything financially. (R. 320-321).

He reported to Dr. Nichols that he has not had any legal problems except for non-payment of child support; he started drinking a maximum of 1 ½ pints of alcohol at the age of 17 because it helped him handle being around people; he does not use drugs; and he smokes about a pack of cigarettes a day. (R. 321).

The claimant told Dr. Nichols that he first applied for disability benefits because of his depression but was turned down; that his kidney stones prevent him from controlling his bladder; that his back hurts all the time and he cannot "pick up heavy stuff"; that he has migraines that he treats with ibuprofen; that he cannot get a job because he cannot read or write; that he has never been hospitalized because of any mental or emotional issue; and that he has never been to counseling. He said that his medications he is supposed to take for his kidneys have helped some but "he does not have the money to buy anything that has been prescribed." (R. 320-21).

He told Dr. Nichols that he gets up in the morning with no "real routine"; he helps his sister take care of the responsibilities of the household chores; he eats one to two meals a day; he does not attend church; and has no friends.  (R. 321).

Dr. Nichols reported that the claimant was "neat and clean"; had good eye contact; and had a mild lisp but she could understand him easily.  The claimant had an anxious mood, congruent thought processes, appropriate affect, "so-so" appetite, decreased energy, crying episodes, and no suicidal ideations.  He was oriented to time, place, and situation; had no evidence of confusion; had no evidence of delusions; denied panic attacks; and had "good" insight and judgment.  (R. 321).

Dr. Nichols administered the WAIS-IV that revealed that the claimant has a Full Scale IQ of 63 and reads on a preschool level but "struggled to read the words he did read."  Dr. Nichols stated that the claimant "is functioning in the Mild range of Intellectual Disabilities" and his diagnoses include "Major Depressive Disorder, Recurrent, Severe"; "Alcohol Use Disorder, Mild"; and "Hx of kidney stones."  She opined that the claimant's prognosis for significant improvement is poor "as he demonstrated problems with dealing with people his entire adult life and the intellectual disability would not be expected to improve."  Dr. Nichols noted that the claimant "has been unable to pay for any medications that have been prescribed"; "his ability to respond appropriately to supervision, co-workers, and work pressures in a work setting is compromised"; he has "deficits" that affect his ability to understand and carry out work-related instructions; and that he "is unable to handle his own funds or to live independently."  (R. 322).

Dr. Robert Estock, a non-examining psychiatric consultant, reviewed the claimant's records on July 1, 2016 at the request of the Social Security Administration.  Dr. Estock found that the claimant has moderate limitations in his activities of daily living; social functioning; and concentration, persistence, and pace.  Based on these moderate limitations, Dr. Estock opined that

the claimant could understand, remember, and complete short, simple one to two-step tasks; could learn and remember a simple work routine if provided sufficient rehearsal; could follow simple directions to find locations and complete tasks; would need verbal instructions because of his limited ability to read and write; could maintain attention for at least two hours to complete simple one to two step tasks; could complete an eight-hour work day with customary breaks; could tolerate non-intense interaction with members of the general public; could tolerate casual, non-intense interactions with coworkers and supervisors; must have supportive and non-threatening supervision and criticism; must have infrequent and gradually introduced changes in the work environment; and could set simple, short-term work-related goals that are realistic.

### The ALJ Hearing

The ALJ hearing took place on April 19, 2018. The claimant testified that he lives by himself in a house for which his nephew pays the rent; that he had a driver's license at one time but it was "pulled for the DUI" and he has no money to get it reinstated; that he has been in jail before for six months to a year; that he smokes a pack of cigarettes a day;  and that the drinks a "four pack" of beer a day.  (R. 75-79).

The claimant testified about his past work and said that he left his job as a car detailer in 1995 because he was in jail; that he left his job at the lumber company because he had no transportation to get to work; that he left his job at the warehouse because of "sickness"; he left his job at Tyson Farms because his "hands swell up so bad and aches and stuff"; that he left a job in 2003 because he was in jail again; and that he left his last job in 2008 because he and his supervisor did not get along and he missed too many days.  (R. 80-84).

He had stints put in his kidneys to help with his kidney stones and has "real pain in weather

in stuff."  His back pain causes pain to shoot down his leg.  He stated that he can stand for about "10-15, 20 minutes" at a time; has three to four bad days a week; can lift a ten-pound bag of potatoes off the floor without straining his back but cannot lift twenty pounds off the floor; and can sit "five, six minutes" before he has to get up and walk around.  (R. 85-88).

The claimant testified that he used to weigh about 290 pounds and now weighs 180 because of stress and not eating because he has "no way to cook nothing" and his family "don't feed me nothing."  The claimant stated that he has conflicts with other people, including relatives, and has been asked to leave places he has lived because of those conflicts.  (R. 88-90).

When asked by his attorney why he does not go to the doctor, the claimant stated that he has "no money to pay for it."  He testified that he has not received any treatment for anxiety or depression because he has no  money.  (R. 85-86).

The claimant's friend Roschel Buggs testified that she has known the claimant "all my life"; that he has struggled with "learning challenges"; that she has never know him to have a job; that she would ask the claimant to cut her grass but he would not show up; that she reads the Social Security letters to the claimant; and that he has problems taking care of his personal hygiene and often smells bad.  (R. 90-93).

The vocational expert Catherine Dillon testified regarding the claimant's past work as an auto detailer, classified as medium, unskilled work; a hand packager, classified as medium, unskilled work; a poultry  hanger, classified as medium, unskilled work; and a lumber handler, classified as heavy, unskilled work.  (R. 94-95).

The ALJ asked Ms. Dillon to assume a hypothetical individual with the same age, educational and vocational background as the claimant who can work at all levels of exertion; can perform simple, routine job tasks; would not have contact with the general public; would have

occasional contact with coworkers; would primarily deal with objects and not people; and would not be required to read or write.  Ms. Dillon testified that such an individual could perform the claimant's past work as a poultry hanger, hand packager, and auto detailer.  She also testified that individual could also work as a kitchen helper, classified as medium, unskilled work with about 302,500 jobs in the nation; a laundry worker, classified as medium, unskilled work with about 443,200 jobs in the nation; a dining room attendant, classified as medium, unskilled work with 318,100 jobs in the nation; a small parts assembler, classified as light, unskilled work with 195,500 jobs in the nation; a laundry folder, classified as light, unskilled work with 440,000 jobs in the nation; and a hand packager, classified as light, unskilled work with 314,000 jobs in the nation.  (R. 95-96).

Ms. Dillon testified that an individual can miss about one day a month and be off task up to and including ten percent of the time and still maintain competitive work.  She also stated that if an individual could not understand, remember, or carry out work-related instructions or could not stand for greater than fifteen minutes, no jobs would be available for that person.

*The ALJ Decision*

On September 24, 2018, the ALJ issued a decision finding the claimant "not disabled." First, the ALJ found that the claimant had not engaged in any substantial gainful activity since March, 18, 2016, the date of his application.  (R. 12).

The ALJ found that the claimant has the severe impairments of depression, intellectual disability, and a history of alcohol use disorder.  But he found that the claimant's mild degenerative joint disease is a non-severe impairment because the objective medical evidence in the record does not support the claimant's subjective allegations of the limiting effects of his back pain and no evidence exists that this condition significantly limits his ability to do basic work activities.  The

ALJ also noted that the May 2011 x-rays of the claimant's lumbar spine showed only minimal degenerative joint disease. (R. 12-13).

The ALJ also pointed out that the claimant did not allege any physical impairments in his Disability Report or in his Function Report. After thoroughly recounting Dr. Rickless' medical findings, the ALJ gave great weight to Dr. Rickless' opinion that the claimant had no limitations regarding sitting, walking, lifting, carrying, handling objects, hearing, or speaking. (R. 12-13).

And the ALJ stated that, although the record remained open for thirty days after the hearing for the claimant's attorney to submit medical records regarding the claimant's alleged stinting of his kidneys, the ALJ received no additional medical records from the claimant regarding his alleged kidney impairment. So, the ALJ found that the claimant had no medically determinable impairment related to his kidneys or ability to urinate. (R. 13, 15).

Regarding the medical record for the claimant, the ALJ noted that it contained medical records belonging to *other* individuals, not the claimant, who have anxiety, high blood pressure, and extreme weight loss. The ALJ indicated that no *medical records* show that *this* claimant suffers from anxiety, high blood pressure, or extreme weight loss.

After thoroughly recounting all of the medical evidence in the record pertaining to the claimant, the ALJ found that the claimant did not have an impairment or combination of impairments that met or medially equaled the severity of a Listing. Specifically, the ALJ found that the claimant did not meet Listing 12.05 regarding intellectual disabilities because the claimant did not have one extreme or two marked limitations in the areas of mental functioning and did not demonstrate the required significant deficits in adaptive functioning required under Listing 12.05, Paragraph B(2). Based on all of the evidence of record, including the claimant's Function Report and testimony at the hearing, the ALJ found that the claimant has moderate limitations in his ability

to understand, remember, or apply information; moderate limitations in his ability to interact with others; moderate limitations in his ability to concentrate, persist, or maintain pace; and mild limitations in his ability to adapt or manage himself.  (R. 13, 17-19).

The ALJ also found that, even though the claimant has a mild intellectual disability, "the evidence indicates that the claimant's functional capacity is greater than alleged."  In making this finding, the ALJ noted that the claimant's self-reports about his functioning showed he has some limitations but he could prepare his meals; go out alone and did not need someone with him; do household chores with encouragement; shop in stores; pay bills and count change; play cards weekly; and spend time with others weekly listening to music and playing football.  The ALJ also stated that the claimant was able to obtain a driver's license but lost his driving privilege because of his DUI conviction; had worked at unskilled jobs in the past  "at the substantial gainful activity level"; only had remote and limited mental health treatment in 2004 and 2007 based on a court referral for an alcohol assessment; had a GAF score of 55 in 2004 and 2007, indicating only moderate limitations in functioning; and had no psychiatric hospitalizations or other inpatient mental health treatment.  (R. 14).

The ALJ "emphasized" that the claimant did not testify that he stopped working or lost any jobs because of his intellectual disability, but left jobs because of lack of transportation, "vague medical conditions," problems with his hands swelling, and problems getting along with a supervisor.  The ALJ also noted that the claimant indicated that some periods of no earning in his work history corresponded directly to periods of his incarcerations.  And the ALJ acknowledged that the claimant said he did not seek medical treatment because of a lack of insurance or financial resources but pointed out that the claimant testified that he smokes a pack of cigarettes a day and drinks a "four pack" of beer a day.  (R. 15).

14

After a "careful consideration of the entire record," the ALJ found that the claimant has the residual functional capacity to perform a full range of work at all exertion levels but with the following non-exertional limitations:  is limited to simple, routine job tasks; can have no contact with the general public; can have occasional contact with coworkers; is limited to jobs that deal primarily with objects and not people; and is limited to a job with no requirement to read or write. (R. 19).

The ALJ noted that Ms. Martin's third-party Function Report contradicted the claimant's own Function Report in several areas.  Contrary to the claimant's reports, Ms. Martin indicated that the claimant could not prepare his own meals; that he only sat by himself as a hobby; that he needed someone to accompany him when he went somewhere; and that he had problems talking and hearing.  Because he found that Ms. Martin's statements were not consistent with the claimant's statements and unsupported by the record as a whole, the ALJ gave them little weight. The ALJ also gave the testimony of Ms. Buggs little weight because she is not a medical source and her statements also were not consistent with or supported by the record as a whole.  (R. 14-15).

After thoroughly discussing Dr. Nichols' report and opinion, the ALJ gave it some weight to the extent that it is consistent with the ALJ's residual functional capacity assessment.  The ALJ acknowledged Dr. Nichols' finding that the claimant has a full scale IQ score of 63, but found that the claimant did not have an extreme or two marked limitations in any areas of mental functioning. The ALJ noted that Dr. Nichol's opinion "was based almost entirely upon one examination of the claimant and his subjective complaints" and noted that the claimant was not truthful with Dr. Nichols when he told her that he had never had any legal trouble.  The ALJ also "emphasized" that, although Dr. Nichols opined the claimant had severe Major Depressive Disorder, the claimant "offered no testimony with respect to depression during the hearing."  But, the ALJ gave the

claimant "the benefit of the doubt" and "identified depression as a severe impairment." But, for the reasons the ALJ had already discussed above, he found that the claimant's functional capacity was greater than alleged by the claimant or found by Dr. Nichols. (R. 16-17).

The ALJ gave Dr. Estock's mental RFC assessment great weight to the extent that it was consistent with the ALJ's RFC's findings and noted that Dr. Estock "fully considered Dr. Nichol's evaluation of the claimant." The ALJ found that Dr. Estock's opinion was consistent with and supported by the record as a whole. The ALJ stated that any discrepancies between Dr. Estock's opinion and the RFC are based on the ALJ's "independent review of the record, consideration of the claimant's hearing testimony, and all other evidence in the aggregate, some of which may not have been available to Dr. Estock at the time of his expressed opinion." (R. 17-18).

The ALJ stated that he fully accounted for the claimant's impairments and symptoms as supported by the evidence in the record; that he limited the claimant to simple and routine work that does not require him to read or write; and that his RFC assessment includes significant restrictions regarding his social interactions with the public and coworkers.

The ALJ found that the claimant could not perform his past relevant work. He specifically indicated that, although the vocational expert testified that the claimant could perform his past work as a hand packager and poultry hanger, those jobs did not meet the requirements for past relevant work. But the ALJ did not explain why those jobs did not qualify as past relevant work. (R. 20).

After considering the claimant's age, education, work experience, and RFC and based on the vocation expert's testimony, the ALJ found that the claimant could perform other jobs that exist in significant numbers in the national economy, including as a kitchen helper, laundry worker, dining room attendant, small parts assembler, laundry folder, and hand packager. Therefore, the ALJ found that the claimant has not been under a disability since March 18,2016, the date he filed

his disability application.

## VI.    DISCUSSION

*Assessing Medical Opinions*

The claimant alleges that the ALJ should have given Dr. Nichols' opinion regarding the claimant's mental limitations more weight because Dr. Nichols was the only doctor who personally examined the claimant.  (Doc. 9 at 18).  This court disagrees and finds that the ALJ properly evaluated Dr. Nichols' opinion and substantial evidence supports the ALJ's findings.

Although Dr. Nichols was an one-time examining, consulting doctor, the ALJ was not required to give her opinion great weight.  *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (a one-time examining psychologist's opinion "was not entitled to great weight").  The ALJ thoroughly discussed Dr. Nichols' report and opinion at length and gave it some weight to the extent that it was consistent with the ALJ's residual functional capacity assessment and the record as a whole.  The ALJ acknowledge Dr. Nichols' finding that the claimant has a full scale IQ score of 63, but found that the claimant only had moderate to mild limitations in his mental functioning.  The ALJ's stated reasons for his treatment of Dr. Nichols' opinion were legitimate and supported by the substantial evidence in the record. *See Tavarez v. Comm'r of Social Security*, 638 F. App'x 841, 847 (11th Cir. 2016) (finding that the "ALJ did not express a legitimate reason supported by the record for giving [the consulting physician's] assessment little weight.").

First, Dr. Nichols did not assess the claimant's mental limitations in terms of mild, moderate, marked, or extreme. Instead, Dr. Nichols gave a vague assessment that the claimant's depression symptoms have "escalated to the point where symptoms are severe" without any specific examples of which symptoms or specifically how they are severe.  And Dr. Nichols found that the claimant's "ability to respond appropriately to supervision, coworkers, and work pressures"

in a work setting is "compromised" and that his "deficits" would interfere with his ability to remember, understand, and carry out work-related instructions.  But Dr. Nichols did not state the *degree* of those "deficits" or the extent to which the claimant's mental abilities are "compromised." The ALJ agreed that the claimant has deficits and that his mental abilities are compromised *moderately* because of his mental impairments, and the ALJ accounted for those moderate deficits in his RFC assessment of the claimant.

The ALJ noted that Dr. Nichol's opinion "was based almost entirely upon one examination of the claimant and [the claimant's] subjective complaints."  Dr. Nichols had no medical records to review to support what the claimant was telling him regarding his limitations because the claimant did not seek treatment in the past for any of his alleged mental limitations.  And the ALJ pointed out that what the claimant told Dr. Nichols regarding him having "no history of any legal problems except for non-payment of child support" was not accurate.  The claimant admitted at the hearing that he had past DUI convictions and had been incarcerated in the past.  So, Dr. Nichols basing his opinion primarily on what the claimant reported to him may not give an accurate depiction of the claimant's mental limitations.

The ALJ "emphasized" that, although Dr. Nichols opined that the claimant had severe Major Depressive Disorder, the claimant "offered no testimony with respect to depression during the hearing."  Dr. Nichols did not have the benefit of the claimant's *sworn testimony* at the hearing where the claimant did not even mention suffering from depression or any limitations flowing from that alleged depression. And despite the claimant's failure to testify about his depression, the ALJ gave the claimant "the benefit of the doubt"; "identified depression as a severe impairment"; and included limitations for it in his RFC assessment despite the claimant's failure to testify about his depression at the hearing.  *See* (R. 16-17).

Moreover, the ALJ noted that the claimant's self-reports about his functioning showed that he has some limitation but found that his activities of daily living supported that the claimant only had moderate limitations in his mental functioning.  The court agrees that the facts that the claimant lives on his own, prepares his meals; goes out alone and does not need someone with him; does household chores with encouragement; shops in stores; pays bills and counts change; plays cards weekly; and spends time with others weekly listening to music and playing football support the ALJ's finding that the claimant has only moderate or mild limitations in his mental functioning and is not totally disabled.

Also, as the ALJ pointed out, the claimant did obtain a driver's license despite his intellectual limitations but lost his driving privilege because of his DUI conviction; worked at unskilled jobs in the past  "at the substantial gainful activity level"; only had remote and limited mental health treatment in 2004 and 2007 based on a court referral for an alcohol assessment; had a GAF score of 55 in 2004 and 2007, indicating only moderate limitations in functioning; and had no psychiatric hospitalizations or other inpatient mental health treatment.  (R. 14).

The ALJ also emphasized the fact that the claimant did not testify that he stopped working or lost any jobs because of his intellectual disability or depression.  In fact, the claimant testified that he left jobs because of lack of transportation, "vague medical conditions," problems with his hands swelling, and problems getting along with a supervisor on only one of his jobs.  The ALJ also noted that some of the claimant's periods of not working in the past directly correlated to periods of his incarcerations.

And the ALJ acknowledged that the claimant said he did not seek medical treatment because of a lack of insurance or financial resources but pointed out that the claimant testified that he smokes a pack of cigarettes a day and drinks a four back of beer a day.  (R. 15).  The court

agrees with the ALJ that the fact that the claimant could afford such expensive daily habits undermines his claim that he could not afford to seek medical treatment if he truly needed to do so.

The ALJ stated with particularity the weight he gave Dr. Nichol's opinion; considered the entire medical record along with that opinion; and found that Dr. Nichol's opinion was only entitled to some weight. The court finds that the ALJ applied the correct legal standards in assessing Dr. Nichols' opinion and that substantial evidence supports the weight he gave to that opinion. See *Romeo v. Comm'r of Social Security*, 686 F. App'x 731, 732 (11th Cir. 2017) (citing *Winschel v. Comm'r of Social Security*, 631 F.3d 1176, 1179 (11th Cir. 2011)) (the ALJ must assess the weight he gives a medical opinion); s*ee also Tavarez v. Comm'r of Social Security*, 638 F. App'x 841, 847 (11th Cir. 2016) (the ALJ must give legitimate reasons supported by substantial evidence to give an opinion little weight).

*Intellectual Disorder under 12.05B*

The claimant argues that the ALJ erred in finding that the claimant did not meet Listing 12.05 for intellectual disability. This court disagrees.

First, the claimant's argument on this issue is premised on the wrong law. All of the claimant's arguments and case law refer to Listing 12.05(C), but that particular section of Listing 12.05 no longer exists. The requirements to meet Listing 12.05 for intellectual disability changed effective January 17, 2017 and the new version of Listing 12.05 applies to all social security applications pending on or after January 17, 2017, which includes this case. *See* 81 F.R. 66138–01.

The claimant has not argued or shown that the ALJ erred in finding that the claimant fails to meet the *revised* Listing 12.05 "paragraph B" that sets out the criteria for establishing an intellectual disorder. As set out more fully in in the "Legal Standard" section of this opinion, to meet Listing 12.05 "paragraph B," the claimant now must satisfy three requirements: 1)

20

significantly subaverage general intellectual functioning evidenced by a full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; 2) significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two of the areas of mental functioning; and 3) the evidence that the intellectual disorder began prior to the age of 22.  20 C.F.R. Pt. 404, Sub. P, App. 1, § 12.05.

As mentioned above under the first issue, the ALJ acknowledged that the claimant meets the IQ score requirement for Listing 12.05 but found that the claimant does not have the significant deficits in adaptive functioning manifested by an extreme limitation or two marked limitations in areas of mental functioning.  After thoroughly recounting all of the evidence in the record, the ALJ found that the claimant only has moderate limitations in his ability to understand, remember, or apply information; moderate limitations in his ability to interact with others; moderate limitations in his ability to concentrate, persist, or maintain pace; and mild limitations in his ability to adapt or manage himself.  (R. 13, 17-19). The ALJ explicitly explained his reasons for his finding that the claimant does not meet revused Listing 12.05 and substantial evidence supports them as the court fully explained under the first issue.

Additionally, Dr. Estock's mental residual functional capacity assessment of the claimant supports the ALJ's finding regarding the claimant's moderate mental limitations in his ability to understand, remember, or apply information; interact with others; and concentrate, persist, and maintain pace.  Dr. Estock reviewed the claimant's entire medical record, including Dr. Nichol's opinion, and found that the claimant had only moderate limitations in all areas of his mental functioning.

Based on a review of the record as a whole, the court finds that substantial evidence in the record supports the ALJ's finding that the claimant does not meet Listing 12.05 for intellectual

disability.

*Vocational Expert Testimony as Substantial Evidence*

The claimant also alleges that the ALJ's reliance on the vocational expert's testimony that other work in the national economy exists that the claimant can perform lacks substantial evidence because the ALJ's hypothetical to the VE did not include *all* of the claimant's alleged limitations.

For a vocational expert's testimony to constitute substantial evidence regarding the jobs the claimant can perform, the ALJ must pose a hypothetical question to the vocational expert that comprises only those limitations supported by substantial evidence in the record. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).

As explained above regarding the previous issues, substantial evidence supports the ALJ's finding that the claimant has at the most moderate limitations in his mental functioning.  And the ALJ incorporated limitations in the hypothetical to the vocational expert and ultimately in his RFC assessment to accommodate those moderate limitations.  So, the court finds that the ALJ did not err in relying on the vocation expert's testimony to support his finding that jobs exist in the national economy that the claimant can perform despite his moderate mental limitations.

## VII.   CONCLUSION

For the foregoing reasons, the court concludes that the ALJ applied the proper legal standards and that substantial evidence supports his decision. The decision of the Commissioner should be AFFIRMED.

**DONE** and **ORDERED** this 24th day of February, 2021.

_Karon O. Bowdre_

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE